**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT MCENHEIMER, *on behalf of himself and similarly situated employees*; | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 22-46 |
| v. | ) ) ) | |
| WALMART, INC., | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Pending before the Court is Plaintiff Robert McEnheimer's ("McEnheimer") Motion to Conditionally Certify a Fair Labor Standards Act ("FLSA") Collective and to Facilitate Notice (Docket No. 90). Since this case began in January 2022, two additional Plaintiffs have opted into McEnheimer's suit: Kim Jenkins and Chris Mongelli. (Docket Nos. 56-57). Defendant Walmart, Inc. ("Walmart") opposes the motion to conditionally certify a collective and send notice. (Docket No. 106). The parties have fully briefed the motion for conditional certification, so the matter is ripe for disposition.[1] For the reasons explained herein, the Court will <u>deny</u> the motion for conditional certification.

I.    **BACKGROUND**

McEnheimer filed his complaint initiating suit in this matter on January 7, 2022. (Docket No. 1). McEnheimer has since filed a Second Amended Complaint ("SAC") and alleges that his employer, Walmart: violated the FLSA, violated the Pennsylvania Minimum Wage Act

---

[1]    The Court notes several related motions are presently pending on the docket. The Court will not address them at this time in this Memorandum Opinion and the accompanying Order.

("PMWA"), breached his contract, and violated the Pennsylvania Wage Payment and Collection Law ("WPCL"). (Docket No. 22). In support of the claims in the SAC, McEnheimer alleges that he worked for Walmart as an Hourly Associate from December 2015 until May 15, 2021, primarily at a Walmart store in West Mifflin, Pennsylvania. (*Id.* ¶ 4). McEnheimer alleges that there are more than fifty Walmart stores in Pennsylvania and, in the motion to conditionally certify a collective, he indicates that Walmart has employed more than 50,000 similarly situated Hourly Associates since December 26, 2020. (*Id.* ¶¶ 15-16; Docket No. 90 at 2). During McEnheimer's employment, he was paid an hourly rate between $10/hour and $20/hour. (Docket No. 22, ¶ 13). In all but the last nine months of his employment, McEnheimer was a general associate at Walmart with various duties, including "stocking, cleaning, unloading trucks, and working the cash registers." (*Id.* ¶ 19). In the last nine months that he worked for Walmart, McEnheimer alleges that he was a delivery driver reporting to a "wholly owned subsidiary of" Walmart. (*Id.* ¶¶ 20-21).[2] McEnheimer alleges that, like him, other Hourly Associates in Pennsylvania were "assigned duties per Walmart's standard job description, namely, reporting to management in a Walmart store and performing the various retail duties assigned by management, including stocking, cleaning, unloading trucks, and working the cash registers." (*Id.* ¶ 25).

Regarding the alleged unpaid overtime that gave rise to this suit, McEnheimer avers that when he worked for Walmart he "regularly worked more than 40 hours in workweeks" and was

---

[2]      McEnheimer alleges that though he reported to this subsidiary—"Walmart In-Home"—he was "still subject to the same policies and procedures he had been subject to prior to that time and the same policies and procedures the other Hourly Associates in … Pennsylvania were subject to." (*Id.* ¶ 23). Lisa McFall, former Senior Manager I and II for the InHome Core Team for Walmart, testified at her deposition that McEnheimer worked in Walmart's digital work group since at least September 2018, and that such group "operates Walmart's Online Pickup and Delivery … business … in Pennsylvania." (Docket No. 106, Ex. 4, ¶¶ 8-9). McFall further indicated that from September 2018 to September 2020, McEnheimer was a personal shopper and that he became a delivery driver in September 2020. (*Id.* ¶¶ 11, 14). McEnheimer was terminated from his position in May 2021. (*Id.* ¶ 27).

therefore entitled to overtime at time-and-a-half pay that, ultimately, he did not receive.  (*Id.* ¶¶ 28-29).  Walmart promised him and other Hourly Associates that they would be compensated for overtime work in "offer letters," "onboarding and training videos," verbal communications, and associates' common understanding of what it meant to be an "hourly" employee.  (*Id.* ¶¶ 30(a)-(d); 31(a)-(d)).  Despite such assurances, McEnheimer alleges that Walmart maintained policies and procedures that caused him "and the other Hourly Associates in … Pennsylvania [to] work unrecorded, and unpaid, time."  (*Id.* ¶ 39).  That is, that despite being "a sophisticated employer" with a keen understanding of federal and state wage payment obligations, Walmart "knowingly and intentionally instituted a common policy and/or practice of failing to pay for time worked during 'mandatory meal breaks' and of punishing workers who could not take meal breaks and refused to misstate in their time records that meal breaks were taken when they were not."  (*Id.* ¶¶ 42-43).

At Walmart, Hourly Associates are required to take a thirty-minute meal break if they work more than six consecutive hours, and Walmart requires Hourly Associates to clock out for that break.  (*Id.* ¶¶ 44-46; Docket No. 91-6 at 3).  McEnheimer alleges that once an hourly associate clocks out, that associate may not clock back in until thirty minutes have passed, "even if they are performing work during those 30 minutes."  (*Id.* ¶¶ 47-48).  When an Hourly Associate does not take a mandatory meal break, they are "punish[ed]" with a "coaching," which is a "disciplinary measure" that keeps an employee "from being transferred or promoted for up to one year," or exposes them to the risk of termination if they receive three coachings.  (*Id.* ¶¶ 49-51).[3]

_____

[3]    Elsewhere in the record, there's evidence that *four* coachings result in termination.  (Docket No. 91, Ex. 11 at 77-78)

McEnheimer explains that, because of this system—including the consequences of failing to take a meal break—he and other Hourly Associates "[were] forced to include a meal break in their time records each workday of six hours or more to show they have taken a mandatory meal break *even when they have been unable to do so*," *i.e.*, that they falsely report meal breaks. (*Id.* ¶ 52 (emphasis added)). McEnheimer alleges that Walmart is aware that its Hourly Associates falsely report meal breaks. (*Id.* ¶ 57 ("Defendant knows and has known since the inception of this policy, custom and practice that Associates in … Pennsylvania … have included meal breaks in their time records even when the Associates have been unable to take the meal break because they have been required to perform their regular duties as Hourly Associates instead of taking the meal break.")). McEnheimer further alleges local management knows that Hourly Associates falsely report meal breaks because they (management) are the ones making Hourly Associates work through meal breaks due to work demands, and because of the data available to them. (*Id.* ¶¶ 60-61). In McEnheimer's view, upper management also knows about falsely reported meal breaks because Walmart's Wage & Hour Department "has the ability, and exercises this ability, to compare hours recorded by the Hourly Associates in … Pennsylvania with time-stamped and employee-identifiable data showing work being performed by the Hourly Associates." (*Id.* ¶ 67). McEnheimer ultimately accuses Walmart of enforcing a policy by which it "pressured the Hourly Associates … to include meal breaks in their time records (despite working through them) in order to avoid punishment" and thereby avoided having to pay overtime to associates. (*Id.* ¶ 73).

McEnheimer says that he "regularly complained to management about these practices (requiring off the clock work, failing to pay for all hours worked, forcing [him] to include meal breaks in his time records despite working through them) for himself and [on behalf of] the other Hourly Associates in … Pennsylvania." (*Id.* ¶ 74). Because he made management aware of unpaid

overtime, McEnheimer alleges that Walmart "knowingly and intentionally violated the FLSA's …

requirement at 29 U.S.C. § 211(c) that it maintain accurate records of time worked, and at 29

U.S.C. § 207(a) that it pay for overtime worked"; violated Pennsylvania common law and the

WPCL by "breaching its contractual duty to pay Plaintiff" and others "their promised … wages";

and breached its contractual obligations by failing to pay for all hours worked.  (*Id.* ¶¶ 75-78).[4]

McEnheimer seeks payment for his yet unpaid overtime, liquidated damages, statutory damages

under the WPCL, interest, litigation costs, and attorney fees, and whatever other relief the Court

might deem appropriate.  (*Id.* ¶ 133).

After McEnheimer filed the SAC, the parties engaged in "Phase I" of discovery "relating

to an anticipated motion for conditional certification under the [FLSA]," to be completed by

December 30, 2022.  (Docket No. 50).  The parties requested several extensions for time to

complete Phase I Discovery (Docket Nos. 52, 58, 60), and eventually informed the Court in a July

2023 Joint Status Report, that they had "completed the agreed-upon productions" and were

working to meet and confer on stipulations relevant to the anticipated conditional certification

motion.  (Docket No. 70).  Several months later, before filing the motion for conditional

certification, the parties asked the Court to stay this matter for mediation, and the Court granted

the request.  (Docket No. 77).  This stay remained in place from October 17, 2023, until March

2024, when the parties submitted a Joint Status Report asking that the stay be lifted.  (Docket Nos.

78, 79).  The Court lifted the stay and set a deadline for McEnheimer and the two opt-in Plaintiffs

(hereinafter collectively referred to as "Plaintiffs" unless otherwise specified) to move for

conditional certification (Docket No. 80).  That motion was ultimately filed on May 28, 2024.

(Docket No. 90).

---

[4]    The present motion relates solely to the FLSA claims.

Plaintiffs' motion asks that the Court conditionally certify a class of "all persons who worked as hourly associates … in Pennsylvania for … Walmart … who recorded working 40 or more hours in [Walmart's] time-keeping system ('Global Time and Attendance' or 'GTA') in one or more workweeks during the period spanning from three years and 154 days before the date this motion was filed … through the pendency of this proceeding."  (Docket No. 90).  Attached to Plaintiffs' motion is a proposed Notice of Collective Action Lawsuit and Opt-in Form (Exhibit 1), as well as a proposed email notice (Exhibit 2).  Plaintiffs further request "an order equitably tolling the statute of limitations for the … Notice Group from the date of this Motion through the sixty-day notice period contemplated" by the same.  (Docket No. 90 at 3).  As indicated *supra*, Walmart opposes certification of the proposed FLSA notice group (hereinafter the "collective" or "proposed collective").  Walmart also opposes tolling of the statute of limitations.

## II.    <u>DISCUSSION</u>

The Court has discretion to conditionally certify a collective in this case of 50,000 Walmart Hourly Associates in Pennsylvania and to facilitate their notice of suit pursuant to 29 U.S.C. § 216(b).  Plaintiffs argue that—like them—other Pennsylvania Hourly Associates were denied appropriate compensation for off-the-clock work performed during unpaid meal breaks.  Walmart argues that Plaintiffs have failed to carry their modest burden at this stage of proceedings to show that similarly situated individuals exist who should be afforded court-facilitated notice of suit.  The standards below govern the Court's consideration of this motion.

The FLSA sets federal standards for "minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013).  Under Section 16(b) of the Act (29 U.S.C. § 216(b)), plaintiff-employees have "the right to bring a private cause of action on their own behalf and on behalf of 'other employees

similarly situated' for specified violations of the FLSA." *Id.* "A suit brought on behalf of other employees is known as a 'collective action.'" *Id.* (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)); *Halle v. West Penn Allegheny Health Systems*, 842 F.3d 215, 222 n. 5 (3d Cir. 2016) (explaining that the phrase "collective action" comes from "the FLSA's legislative history" and has been "accepted as the appropriate designation for the type of representative action described in FLSA § 216(b)" (citing H.R. Rep. No. 80–326, at 13 (1947) (Conf. Rep.))).  An FLSA "collective action" may benefit plaintiffs who have more resources collectively than individually, and it may benefit the judicial system by consolidating individual claims into one collective action where the "same alleged discriminatory activity" underlies numerous claims.  *Holley v. Erickson Living*, No. CIV.A. 11-2444, 2012 WL 1835738, at *2 (E.D. Pa. May 21, 2012) (quoting *Hoffmann–La Roche*, 493 U.S. at 170).   Collective actions pursuant to the FLSA operate differently than "a typical class action under Federal Rule of Civil Procedure 23" insofar as individuals in a Rule 23 class action are in a class by default but may opt-out, while the FLSA "requires similarly situated plaintiffs to *opt-in* to the lawsuit." *Id.* (emphasis added).

Beyond providing a right to collective action, Congress has given little insight into how FLSA collective actions ought to proceed.  *Halle*, 842 F.3d at 223.[5]  Without notable congressional guidance, the courts—including the Third Circuit—have adopted a two-tier process for collective actions.  *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (citing *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 n. 5 (3d Cir. 2011) (describing the two-tier approach as widely accepted, though "nowhere mandated"), *rev'd on other grounds*, 569 U.S. 66 (2013)).

---

[5]     "Congress has provided no framework setting forth how and when it is to be determined whether employees are 'similarly situated,' the significance of 'party plaintiff' status, or … who may appeal a collective action determination and when that appeal may be taken.  Nor have procedural rules been promulgated to guide courts and parties in processing collective actions." *Id.*

Step one is known as "conditional certification" where courts make "a preliminary determination as to whether the named plaintiffs have made *a modest factual showing* that the employees identified in their complaint are similarly situated." *Williams v. Bob Evans Restaurants, LLC*, No. CV 18-1353, 2022 WL 1120048, at *3 (W.D. Pa. Apr. 14, 2022) (citing *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013)) (cleaned up and emphasis added); *Huang v. Sakura Mandarin, Inc.*, No. CV 21-3757, 2022 WL 4585533, at *2 (E.D. Pa. Sept. 29, 2022). This first step is where the Court finds itself with respect to this case today.  At this juncture, the Court's objective is merely to determine whether "similarly situated plaintiffs *exist*." *Bruno v. Wells Fargo Bank N.A.*, No. 2:19-CV-00587-RJC, 2021 WL 964938, at *2 (W.D. Pa. Mar. 15, 2021) (emphasis added) (citing *Zavala*, 691 F.3d at 536); *Symczyk*, 656 F.3d at 192 ("During the initial phase, the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff.").  In *Zavala*, the Third Circuit explained that "conditional certification is not really a certification"; rather, it is an exercise of a district court's discretion "to facilitate the sending of notice to potential class members."  691 F.3d at 536 (cleaned up); *Halle*, 842 F.3d at 224 ("Conditional certification, therefore, is not a true certification, but rather an exercise of a district court's discretionary authority to oversee and facilitate the notice process.").  Plaintiffs' burden at this step is low; they merely must show there is a "factual nexus between the plaintiff's situation and the situation of other current and former employees sufficient to determine that they are similarly situated." *Holley*, 2012 WL 1835738, at *3 (quoting *Pereira v. Foot Locker, Inc.*, 261 F.R.D. 60, 63 (E.D. Pa. 2009)) (cleaned up); *Symczyk*, 656 F.3d at 192–93 (rejecting some courts' "substantial allegation" standard for conditional certification).

While the evidentiary burden for conditional certification is low, the factual nexus required here is not satisfied by mere speculation as to similarity of circumstances; rather, plaintiffs must produce "some evidence" of the nexus between how "the employer's alleged policy affected [the named plaintiff(s)] and the manner in which it affected the other employees." *Meals v. Keane Frac GP LLC*, No. CV 16-1674, 2017 WL 2445199, at *3 (W.D. Pa. June 6, 2017) (quoting *Symczyk*, 656 F.3d at 193). To that end, plaintiffs should produce some evidence of common facts or "a common policy affecting all the collective members." *Bob Evans*, 2022 WL 1120048, at *4 (quoting *Meals*, 2017 WL 2445199, at *3). Another way to articulate the standard is that "[p]laintiffs must show three things: (i) an employer policy, (ii) that affected the Plaintiffs in a particular way, and (iii) that also affected other employees in a similar way." *Id.* (citing *Dunkel v. Warrior Energy Servs., Inc.*, 304 F.R.D. 193, 200 (W.D. Pa. 2014)).[6] At this first step, courts do not "weigh the evidence, resolve factual disputes, or reach the merits of [plaintiffs'] claims," but courts nonetheless do not review plaintiffs' evidence in a "vacuum." *Id.* (quoting *Reed v. Empire Auto Parts, Inc*., No. 13-cv-5220, 2015 WL 761894, at *3 (D.N.J. Feb. 23, 2015)). That is, courts review plaintiffs' evidence "in light of the evidence submitted by [d]efendants." *Reed*, 2015 WL 761894, at *3.[7]

---

[6]    Eventually—when Plaintiffs seek final certification—the factors that will be considered in the "ad hoc," "case-by-case basis" determination of whether "named plaintiffs have satisfied [their] burden by a preponderance of the evidence," *Halle*, 842 F.3d at 226, include "(but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Zavala*, 691 F.3d at 536–37.

[7]    With respect to inferences from facts, courts reviewing conditional certification motions should avoid putting "judicial thumbs (or anvils) on the scale" and thus take care to "oversee the notice process agnostically." *Swales v.. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 436 (5th Cir. 2021).

Because plaintiffs' step-one burden is "modest," courts have noted that "motions for conditional certification are generally successful." *Bruno*, 2021 WL 964938, at *2 (quoting *Rood v. R&R Express, Inc.*, No. 2:17-CV-1223-NR, 2019 WL 5422945, at *2 (W.D. Pa. Oct. 23, 2019)). Even so, their general success does not mean that granting of conditional certification motions is an inevitability. *Huang*, 2022 WL 4585533, at *2 (explaining that though the modest factual showing standard is "fairly lenient," it "does not compel automatic certification at the notice stage" (quoting *Mitchell v. Covance, Inc.*, 438 F. Supp. 3d 341, 346 (E.D. Pa. 2020))).; *Moore v. PNC Bank, N.A.*, No. 2:12-CV-1135, 2013 WL 2338251, at *5 (W.D. Pa. May 29, 2013) ("Certification at the notice stage, although governed by a lenient standard, is not automatic.  A plaintiff must instead show a 'factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees.'" (quoting *Symczyk*, 656 F.3d at 193)).

If a collective is conditionally certified at step one, then "individuals seeking to join the collective action typically file notices providing their written consent to participate." *Bob Evans*, 2022 WL 1120048, at *3.  The case will then "proceed[] to the second step where the parties file motions seeking final certification or decertification" that are subject to a "more stringent" standard in which the named plaintiffs' burden is to show "by a preponderance of the evidence that the members of the collective are 'similarly situated.'" *Id.* at *4.  *See E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 50 (2025) ("[T]he preponderance-of-the-evidence standard has remained the default standard of proof in American civil litigation.").  "Similarly situated" means to be "subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id.* (quoting *Halle*, 842 F.3d at 226).  If a collective action is decertified, the district court dismisses the opt-in plaintiffs and allows the named plaintiffs to go to trial. *Halle*, 842 F.3d at 226.  If the matter is successful at final certification, then the matter goes to trial as a collective

action by representatives. *Id.*[8] As noted *supra*, the present motion pertains to step one, conditional certification.

Bearing these processes and standards in mind, the Court turns to Plaintiffs' motion for conditional certification. Phase I of discovery yielded, among other things, Plaintiffs' deposition testimony, deposition testimony of witnesses for Walmart, and work-data produced by Walmart for Plaintiffs and some 597 alleged similarly situated Hourly Associates in twenty different Walmart stores in Pennsylvania who used Global Integrated Fulfillment ("GIF") and me@Walmart, which are two applications of many (thirteen or more in total) that Hourly Associates use in the course of their employment. (Docket No. 90, ¶ 4).[9] Walmart has its employees use these "various electronic applications" ("apps") to "access data, perform tasks, report on their progress, communicate with others, and perform various other work or personal activities." (Docket No. 107-2, ¶ 4). These apps are accessible either on employees' "personal

---

[8] The two-tiered approach and modest factual standard are well-established in the Third Circuit, and the Court therefore applies them to the pending motion. However, as the Third Circuit noted in *Zavala*, the two-tier conditional certification process is nowhere mandated. This observation has led some courts to express noteworthy concerns about the process. In *Swales v. KLLM Transp. Servs., L.L.C.*, the Fifth Circuit rejected the "two-step certification rubric" set out in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). 985 F.3d 430, 434 (5th Cir. 2021). The *Swales* court explained that the FLSA only allows those who are "similarly situated" to be certified as a collective and that—in certifying proposed collectives—the courts may not dilute the FLSA "similarly situated" standard in a way that turns court-approved notice into "a claims-solicitation tool" rather than a "case-management tool." *Id.* at 442. To avoid scenarios where conditional certification effectively becomes an improper mass solicitation, the *Swales* court recommended that district courts "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated,'" "authorize preliminary discovery accordingly," and make an "initial determination … as early as possible." *Id.* at 441.

The *Swales* court's concern for the importance of "judicial neutrality," *id.* at 436, in FLSA collective actions is warranted considering that "the decision to send notice of an FLSA suit to other employees is often a dispositive one, in the sense of forcing a defendant to settle—because the issuance of notice can easily expand the plaintiffs' ranks a hundredfold." *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1007 (6th Cir. 2023). While *Swales* raises valid concerns and while the text of the FLSA offers no mandate or directive to implement the two-step approach, the Court is bound by controlling precedent in the Third Circuit and thus will follow the two-step process.

[9] Walmart produced this "tabulation of … timekeeping and work activity data … for a sample of randomly selected Associates" using two of Walmart's work applications. (Docket No. 92 at 5).

mobile devices and/or on company-owned equipment issued or made available to associates by Walmart."  (*Id.* ¶ 7).  Regarding the GIF and me@Walmart apps, from which data was produced for Phase I of discovery, the GIF app is used by certain associates in selecting and processing online purchases to "log items as 'picked' after [employees] locate and collect them from within the store and as 'substituted' if they collect substitutes for unavailable items."  (Docket No. 107-3, ¶ 6).  The GIF app is also used to "log orders as 'dispensed' after the orders are handed over to … customer[s]."  (*Id.*).   The me@Walmart app can be used to "check product pricing, communicate with other associates, and clock in and out."   (Docket No. 107-2, ¶ 10).  Me@Walmart also has "scanning and other stocking functions" that have been used in Pennsylvania Walmart stores since April 2021.  (*Id.* ¶ 11).  Data from these two apps have been analyzed by a consultant retained by Plaintiffs, and Plaintiffs argue such data and analysis show that Hourly Associates regularly performed work during unpaid meal breaks.

Plaintiffs contend that this Phase I evidence shows that "Walmart designed a series of policies related to 30-minute mandatory unpaid meal periods in Pennsylvania that, together with the common practice of placing excessive work demands on the Associates, compelled Plaintiffs and the Associates to work off the clock without compensation during unpaid meal periods." (Docket No. 91 at 1-2).  As stated above, the Court reviews this evidence in light of Walmart's proffered evidence to decide whether Plaintiffs have made the modest factual showing needed for conditional certification.[10]  Ultimately, as the Court will explain herein, Plaintiffs have not met

---

[10]     Courts have sometimes found it appropriate to expect more from plaintiffs who seek conditional certification after an opportunity for discovery. *See, e.g., Sloane v. Gulf Interstate Field Servs., Inc.*, No. 4:16-CV-01571, 2017 WL 1105236, at *6 (M.D. Pa. Mar. 24, 2017) ("Accordingly, district courts in this circuit have applied an intermediate standard to the 'similarly situated' inquiry if the parties have already engaged in discovery.").  *But see Bowser v. Empyrean Servs., LLC*, 324 F.R.D. 346, 351 (W.D. Pa. 2018) (distinguishing *Sloane* and citing cases for the general premise that "[d]istrict courts have generally found that a more heightened standard at the conditional certification stage is not appropriate when discovery has not been concluded, no plaintiffs have opted-in, and/or the case is not ready for trial").  The Court here

their burden for conditional certification because, to arrive at a modest factual showing, Plaintiffs would need significant inferences that are not supported by the record.

As an initial matter, the Court considers Plaintiffs' evidence in the context of Walmart's written policies, which indicate that Hourly Associates are required to take unpaid thirty-minute meal breaks for days in which they work more than six hours: "If you work more than six consecutive hours, you will receive an uninterrupted meal period of at least 30 minutes at some time during your shift." (Docket No. 91, Ex. 5). Walmart policies also provide that such meal breaks are "unpaid," "[associates] must clock out at the start of [a] meal period and clock in when returning to work," and the policy prohibits working during meal periods. (*Id.* ("You should be completely relieved of duty during your meal periods and you must not perform any work during your meal periods. If your meal period was interrupted with work, you must complete an appropriate time adjustment form.")). In its "Associate Pay Policy," Walmart addresses "Timekeeping Integrity" and forbids "all *off the clock work* and will not tolerate working off the clock or requests for others to work off the clock." (*Id.*, Ex. 3). Therein, Walmart instructs that "*off the clock*" work includes "[p]erforming any work prior to clocking in" and "[p]erforming any work during non-working time, such as while clocked out for [a] meal period." *Id.*

If the Court were to look only at Walmart's written policies there would be no basis for FLSA conditional certification because Walmart forbids its Hourly Associates in Pennsylvania from performing off-the-clock work. In fact, Walmart forcefully prohibits off-the-clock work.

---

applies the modest-factual-showing standard instead of a heightened standard because discovery in Phase I was cabined to step one. *See McGhee v. TOMS King, LLC*, No. 2:19-CV-01470-RJC, 2021 WL 1176097, at *4 (W.D. Pa. Mar. 29, 2021) ("While the Court appreciates that some discovery has taken place in this case, such discovery … was expressly limited to the issue of conditional certification"; therefore, where "discovery [had] not concluded, no potential plaintiffs [had] opted-in, and the case [was] not trial-ready," the court declined to apply a heightened intermediate standard).

Walmart's meal-break policy is therefore facially lawful. *Jones v. Does 1-10*, 857 F.3d 508, 515 (3d Cir. 2017) ("[E]mployers need not compensate employees for bona fide meal periods because those are not considered to be compensable worktime." (citing 29 C.F.R. § 785.19(a)). Plaintiffs do not argue otherwise.[11] That said, an employer's written policies are not the end of the Court's inquiry because an FLSA collective action may be based on unwritten, unofficial, or implied policies, as well as employer practices. *See, e.g.*, *Pereira*, 261 F.R.D. at 66-67 ("Pereira has additionally offered an Operations manual, employee complaints of off-the-clock work from across the country, stern and direct correspondence to managers about going over the allotted hours, hours budgets for individual stores and evidence of time shaving and off-the-clock sales and cash outs from around the country."); *Bruno*, 2021 WL 964938, at *4 (conditionally certifying a collective where Wells Fargo Home Mortgage Consultants consistently "described Wells Fargo's practice to require off-the-clock work, despite its written policies to the contrary").

Plaintiffs argue, notwithstanding written policies, that Walmart's unofficial policies and practices caused Hourly Associates to falsely report meal breaks for times they continued working during periods when they had clocked-out for a meal break, or for times when they took no meal break but later adjusted their schedules to reflect a made-up meal break. Plaintiffs argue that their testimony, the testimony of Walmart witnesses, and the timekeeping data and analysis concerning Plaintiffs and 597 other Hourly Associates from twenty Walmart stores makes a modest factual showing that they and other Walmart Hourly Associates were similarly impacted by unwritten, unlawful Walmart policies and practices.

---

[11]    "On paper, Walmart's policies and the instructions of its managers were unambiguous—Associates need to just take their 30-minute unpaid meal period and stop working."  (Docket No. 92 at 14).

Looking at Plaintiffs' testimony, the named Plaintiffs report that they all felt pressured to work during meal breaks, even though the three of them held different positions, at different times, answering to different supervisors, and in different stores.   As noted above, McEnheimer worked at a West Mifflin store.  Mongelli worked at a Carnegie store and a related warehouse.  Jenkins worked at stores in Monaca and Carnegie.  (Docket No. 92 at 10 n. 6).  Plaintiffs' roles at those stores included personal shopper, department manager, CAP team supervisor, in-home delivery driver, stocking, sales, and freight.  (*Id.*).  McEnheimer testified that in many instances, due to workload, he felt compelled to work through a lunch break.  (Docket No. 91, Ex. 8 at 18 ("You have a nine-hour shift … up to one hour unpaid lunch.  But in many instances, I had to work through that lunch due to workload and tasks assigned for me from my manager.")).  Sometimes McEnheimer wanted to take a meal break, but was asked to delay his break repeatedly on account of which he ultimately ran out of time for a break before clocking out.  (*Id.* at 55 (explaining that, when trucks had to be unloaded, management would tell McEnheimer to "[j]ust do it.  You will get your break later" but management "never [came] back and [said], 'You guys towed the line for us, here is a 100 dollar Wal-Mart card.'  Nothing.")).

Like McEnheimer, Mongelli recalled feeling as though his work demands at Walmart were unrealistic, and said that he therefore worked through meal breaks to keep up with workload. (Docket No. 91, Ex. 9 at 57-58 ("I need that money … You do what you have to do to get the job done"); 104 ("In order to get the job done, I recorded a time for lunch.  I didn't necessarily take it, and I worked straight through[.]")).  Mongelli believed this was a common practice though he was also "sure there's people that take a lunch."  (*Id.*).  Mongelli himself took lunches sometimes, though he indicated that "more times than not" he recorded a lunch but "didn't necessarily take it."  (*Id.* at 57).  Mongelli explained that he violated Walmart's meal-break policy because if he

could not meet his managers' productivity expectations "then it looks like you can't do your job" and "[y]ou can be replaced." (*Id.* at 58).[12]  To explain the fear of underperformance they felt, Plaintiffs point to evidence indicating that Hourly Associates could be subject to disciplinary consequences if they refused work demands, *e.g.*, evidence indicating that if an associate refused to perform a task there would be a "conversation … of why the associate is refusing to do the task" and, if the task was within their job description and they had no legitimate basis for refusing it (*e.g.*, religious objection, physical limitation, etc.), then the manager would be permitted to administer a coaching.  (Docket No. 91, Ex. 11 at 117).

In Plaintiffs' experience, they believed that the goals that Walmart sets for productivity were unrealistic by design, *i.e.*, that Hourly Associates were overworked intentionally, not by accident.  (*See, e.g.*, "I had to work through … lunch because there was just the unrealistic expectation that you – a single person is going to get all of this stuff done," (Docket No. 91, Ex. 9 at 57); "The app told you where to go, where to be" and "gave you very strict time frames" that failed to account for "breaks" and instead filled the time with "six or seven hours [sic] worth of deliveries," (*Id.,* Ex. 8 at 86)).  Plaintiffs say there is evidence that supports Walmart's knowledge of intense workloads that resulted in unwritten policies or practices of working through meal breaks and/or Walmart's knowing acceptance of such work.  For example, Plaintiffs point to an email, dated December 27, 2021, sent to a returning leader indicating that there were issues with attendance that needed to be "cleaned up," and a report concerning Region 20[13] "hiring

---

[12]     Plaintiffs argue that their evidence, including their own testimony, shows that particularly in 2020 and 2021 with COVID-19 there was a "crunch" of intense work that made it difficult to take breaks. (Docket No. 92 at 16).

[13]     Region 20 covers "approximately 113 stores" in the "the east side of Ohio, … a little bit of West Virginia, … [and] two Pittsburgh markets."  (Docket No. 91, Ex. 12 at 20-22).

challenges." (Docket No. 92, Exs. 21 and 22). According to Plaintiffs, the evidence submitted to date shows that Walmart's productivity expectations for what Hourly Associates could realistically accomplish was a company-wide issue, not an issue at individual Walmart stores or associated with certain managers. To support such an inference, Plaintiffs point to Walmart's goals for associate hours and productivity and the centralization of how those goals were set. For instance, Jay Cordray—a former Region 20 Vice President of Operations—testified at his deposition that Walmart has standards for how much time it takes for particular tasks to be performed and what kind of workforce is needed to meet those goals. (Docket No. 91, Ex. 12 at 252).

Plaintiffs argue that, Walmart's productivity goals were purposely unachievable, so they and other Hourly Associates engaged in a widespread practice of falsely reporting meal breaks to make up the difference between the work they did and they work they felt they had to do. (Docket No. 91, Ex. 8 at 43 ("I'm just saying this survival mechanism that grew, morphed out of this situation of, 'Hey, you know what, these managers are going to walk this grocery aisle at 6:15. I better be done or real close to being done. Or I'm going to get in trouble.'"); Ex. 9 at 89 ("[B]ecause of the workload and just … the fear. I mean, the fear of losing your job."); Ex. 10 at 36 ("If you don't record a lunch break, you could be disciplined by points or terminated. You don't do all your freight, you get disciplined.")). Sometimes that meant entering completely made-up breaks into the timekeeping system. (Docket No. 91, Ex. 9 at 114-15 (describing what Mongelli referred to as "Bullshit lunches"), 223). Other times that meant tolerating interruptions to meal breaks. For example, Mongelli testified that in addition to the times he felt he had to report a fake meal break to keep up with demand, there were also times when he perceived pressure to return early from a meal break to work, therefore cutting his meal break short without reporting its interruption. (*Id.* at 170-71). Mongelli felt this pressure when, among other things, a team lead asked him how

17

much time he had left on his lunch. (*Id.*).[14]  In addition to fake breaks and interrupted breaks, Plaintiffs also testified about forgotten breaks.  For instance, Jenkins sometimes forgot to punch out for lunch and did not realize she had not taken a lunch until it was late in the day.  (Docket No. 91, Ex. 10 at 72).

Plaintiffs acknowledge that there is evidence in the record showing that they were warned against missing meal breaks and knew they could remedy missed meal breaks pursuant to Walmart policy that dictated that associates were meant to submit a "National Rest Break/Meal Period Investigation Worksheet" explaining why a meal break had been missed and how it would be remedied.  (Docket No. 91, Ex. 15).  Though meal exceptions (remedies for having missed a meal break) were available, Plaintiffs ask this Court to infer from certain evidence in the record that they and other Hourly Associates were discouraged from seeking meal exceptions and surmise that Walmart's attention to meal breaks and exceptions was more about eliminating exceptions than ensuring Hourly Associates took all appropriate breaks.  (Docket No. 92 at 11-13).  For instance, McEnheimer testified about a time when he asked "Jane F." for a meal-break exception when he had not had time to take his break.  (Docket No. 91, Ex. 8 at 30).  McEnheimer recalled that Jane F. approved the exception, also referred to as an "allowance," but told McEnheimer it was something he could "get fired for."  (*Id.*).  When McEnheimer was asked at his deposition to clarify whether, by this, Jane F. meant that "if [McEnheimer] [did not] take [his] meal break, it is

---

[14]    Mongelli explained meal break interruptions thus: Q: "And you viewed him asking how much time you had left on your lunch as an interruption?"  A: "Definitely.  I mean … he's standing there tapping his foot and giving you – you know, just almost trying to intimidate you.  You know, 'How much time you got left on your lunch?  We got shit to do.  I need to talk to you.  I need to talk to you now,' and it's like, 'Well, I just punched out,' so technically … I got at least 30 minutes[.]"  (Docket No. 91, Ex. 9 at 170-71).  Mongelli testified that when he reported that kind of behavior nothing was done to address it, particularly because he was "one of those people" who were on "certain managers' shit lists" who could "complain until [he was] blue in the face … [and] it don't mean anything."  (*Id.* at 171).

a violation of Walmart policy[?]," McEnheimer answered by saying that there was a "flip side" of the conversation insofar as "you have associates that are not finishing their task or their workloads" which can lead to a "coaching," *i.e.*, discipline. (*Id.* at 30-31). McEnheimer explained that he thus saw Walmart's stance as a catch twenty-two whereby to avoid a coaching for either missing lunch or not finishing work, he felt he "had to work through part of [his] lunch, all of [his] lunch just to get caught up." (*Id.*). In a similar vein, Mongelli testified that he once "got an ear full for not taking a lunch." (*Id.*, Ex. 9 at 122). For her part, Jenkins testified that she forgot to take a lunch a few times and, when she got to the end of her shift and couldn't clock out without a meal break, she filled out a paper indicating she forgot to punch out for lunch or someone would fill out a paper for her. (*Id.*, Ex. 10 at 71-73). Jenkins also testified that she was warned against skipping meal breaks and that she was told she might be terminated for such behavior. (*Id.* at 80).

According to Plaintiffs, the purported remedy for missing a meal-break—having the Hourly Associate and management complete the National Rest Break/Meal Period Investigation Worksheet and potentially call the Walmart Wage and Hour Hotline so that the employee could log a meal break and clock out[15]—put pressure on Hourly Associates to just "record that they worked unpaid meal periods irrespective whether they received a full and uninterrupted meal period." (Docket No. 92 at 13 (describing the meal exception process and the potential consequences of receiving a coaching or further discipline)). That is, Plaintiffs perceived that meal exceptions created "trouble" and the "out" that made all that trouble go away was to have Hourly Associates report fake meal breaks. (*Id.* at 14). Plaintiffs argue their perception in this regard is further supported by what they refer to as evidence of Walmart's vigorous curtailment of meal

---

[15]    McEnheimer and other Hourly Associates indicated that Walmart's timekeeping system required entry of a meal break before an employee could clock out. (Docket No. 91, Ex. 9 at 91; Ex. 10 at 37 (Q: "What do you mean you can't punch out?"  A: "You can't.  It will tell you you missed lunch.")).

exceptions at the institutional level. Plaintiffs argue the evidence that shows Walmart takes such a stance on meal exceptions includes that: "Walmart tracked meal exceptions at each Pennsylvania store and reminded store managers multiple times per week how many exceptions were appearing at each store" (*Id.* at 11-12); Brian Cipoletti, a former manager at McEnheimer's West Mifflin store, testified at his deposition that store managers and market leads would receive a document more than once a week that tabulated meal exceptions (Docket No. 91, Ex. 11 at 122); when asked about an acceptable number of meal exceptions, Cipoletti testified that "the goal was to have none" (*id.* at 124); and Joey Mendoza, a Walmart market coordinator for Region 20, sent an email indicating that there was a need to "dig into meal exceptions" and to "make sure we are having conversations around meal/break policies." (Docket No. 92, Ex. 16 at 3).

Plaintiffs further argue that app usage data and analysis also shows Walmart had an unwritten policy of directing or permitting Hourly Associates to work through unpaid lunches. Plaintiffs argue that from the GIF and me@Walmart app data processed and tabulated by their litigation expert Dr. Liesl Fox, the Court can see that Hourly Associates were working off-the-clock by looking at retroactively added breaks or edited meal periods because those usually correspond to meal breaks that they worked through. (Docket No. 92 at 20). Plaintiffs further explain that Hourly Associates often clocked out for a meal break but continued to work, which is borne out by data produced for 600 total associates (including Plaintiffs) showing GTA clock-in/clock-out data, as well as timestamped app activity data that corresponds to work activity. (*Id* at 21). Dr. Fox, in her declaration concerning her analysis of this data, indicated that she has over twenty-five years of experience in statistical consulting. (Docket No. 92, Ex. 1). For this case, she was asked to "tabulate the number of **work application events** reflected in the GIF and me@Walmart data"—which she refers to as "Work Activity"—"for a given Hourly Associate that

occurred during a recorded unpaid meal period" as reflected by the GTA.  (*Id.* ¶ 2 (emphasis added)).  Dr. Fox also tabulated how many "unpaid meal period shifts … were added after the fact, edited, or otherwise adjusted after the unpaid meal period purportedly occurred."  (*Id.*).  To that end, Walmart produced "a unique ID for the hourly associates included in the GTA Data and GIF Data records" and for the "me@Walmart Data, Walmart provided" a document that "identified the ID associated with each individual me@Walmart Data files."  (*Id.* ¶ 5).  In addition to work activities generally, Dr. Fox also analyzed printing and scanning events specifically.  (*Id.* ¶ 10).  Based on her review, Dr. Fox found that of the 600 surveyed Hourly Associates,[16] there were "520 associates for whom *either* GIF Data or me@Walmart Data records could be matched to the shift times recorded in the GTA Data" and "264 associates for whom *both* GIF and me@Walmart Data records could be matched to shift times recorded in the GTA."  (*Id.* ¶ 11 (emphases added)).  Dr. Fox's analysis led her to find that of the associates for whom both GIF and me@Walmart data was available, work application events were recorded during one or more meal periods for 98.5% of them, and print and scan activities were recorded for 72.7% of them.  (*Id.* ¶ 12).  97% of Hourly Associates with both GIF and me@Walmart data had "an added late, edited, or adjusted unpaid meal period."  (*Id.* ¶ 14).  Other relevant data points include that for those 483 associates who had me@Walmart data, print or scan activity was recorded during one or more unpaid meal breaks for 34.4% of them.  (*Id.* ¶ 12).  Of the 301 associates for whom GIF data was analyzed, 45.2% of them had work application events recorded during one or more unpaid meal periods.  (*Id.*).  Dr. Fox also found that for Hourly Associates with GIF or me@Walmart events during unpaid meal periods in

---

[16]    Walmart provided GTA data between January 7, 2019, and December 31, 2022, for a sample of 600 Hourly Associates.  (*Id.* ¶ 4).  GIF data was produced for 325 associates starting January 26, 2019, and me@Walmart data was produced for 490 associates starting April 21, 2021.  (*Id.*).  Some GTA and GIF data predating January 2019 was available, but as outlier data it was excluded from Dr. Fox's tabulations.  (*Id.* at n. 3).

weeks with forty or more hours in GTA data, the data showed work application events occurred during one or more unpaid meal periods for: 100% of the 187 Hourly Associates for whom both GIF and me@Walmart data existed; 24.1% of 377 associates for whom me@Walmart data was produced when considering print and scan activity only; and 40.4% of the 213 Hourly Associates for whom GIF data was produced.  (*Id.* ¶ 13).  For the 20 Walmart store locations identified for purposes of Phase I discovery, Dr. Fox determined that 100% of such stores had Hourly Associates for whom work application events appeared during one or more unpaid meal periods.  (*Id.* ¶ 16).

Based on all this evidence—Plaintiffs' personal experiences, Walmart's written policies, certain Walmart internal communications, and the GIF and me@Walmart data and Dr. Fox's analysis, Plaintiffs say they have met their modest factual burden for conditional certification such that 50,000 Hourly Associates in Pennsylvania should be afforded Court-facilitated notice of this matter.  However, in the Court's view the inferences Plaintiffs seek to assume are a bridge too far. Plaintiffs rely heavily on what they perceived to be the implied meanings behind their managers' actions and Walmart's implementation of various policies expressly instructing employees to take meal breaks, account for their work time, and correct errors or missed meal breaks accordingly. But when the Court considers Plaintiffs' evidence agnostically and in context, it becomes apparent that this case is distinguishable from those matters in which courts have conditionally certified collective actions based on unwritten policies or policies implied by employer practices, and that— in this case—there is a "disconnect with [Plaintiffs'] allegations and showing that [Walmart] had a [common] policy or practice of violating the FLSA." *Walker v. Health & Hosp. Corp. of Marion Cnty.*, No. 115CV01978JMSTAB, 2016 WL 7179370, at *10 (S.D. Ind. Dec. 9, 2016).

The FLSA prohibits overtime work without statutorily determined premium compensation and, further, imposes on employers a "duty … to exercise its control and see that the work is not

performed if it does not want it to be performed." 29 C.F.R. § 785.13. That is, management "cannot sit back and accept the benefits" of unpaid labor, and "mere[ly] promulgat[ing] … a rule against such work is not enough." *Id.* The FLSA thus punishes employers who know of unpaid work or who *should* have known of unpaid work, *i.e.*, had constructive knowledge of it. 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time," therefore, time that "[t]he employer knows or has reason to believe that [an employee] is continuing to work" "is working time."); *Walker*, 2016 WL 7179370, at \*10 ("Even if an employer has promulgated a rule against overtime or a procedure to report overtime, the employer may still be liable if it should have discovered by exercising reasonable diligence that its employees were not following the rule." (quoting *Boelk v. AT & T Teleholdings, Inc.*, No. 12-CV-40-BBC, 2013 WL 3777251, at \*6 (W.D. Wis. July 19, 2013)). That said, managers are not held responsible for failing to pay employees for overtime work if the overtime work is concealed from them, and "[t]here is no violation of the FLSA if the employee performs uncompensated work but 'fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work.'" *McEachern v. George Junior Republic in Pa.*, No. CV 18-395, 2020 WL 1307421, at \*7 (W.D. Pa. Mar. 19, 2020) (quoting *Stanislaw v. Erie Indem. Co.*, No. CA 07-1078, 2012 WL 517332, at \*4 (W.D. Pa. Feb. 15, 2012) (finding evidence of constructive knowledge for FLSA overtime violations sufficient to defeat a motion for summary judgment where there was significant evidence that managers "squelched" truthful reports of overtime pay)).

Courts have generally found that certain culpable conduct like encouraging artificially low overtime reporting prevents employers from disclaiming knowledge of uncompensated labor. For instance, in *Allen v. Bd. of Public Educ. for Bibb County*, the Eleventh Circuit Court of Appeals explained that while "[t]here is no violation of the FLSA where the employee performs

uncompensated work but deliberately prevents his or her employer from learning of it," an employer may not "disclaim knowledge" "when an employer's actions squelch truthful reports of overtime worked, or where the employer encourages artificially low reporting."  495 F.3d 1306, 1319 (11th Cir. 2007) (citing *Forrester v. Foodliner*, 646 F.2d 413, 414 (9th Cir. 1981), and *Brennan v. Gen. Motors Acceptance Corp.,* 482 F.2d 825, 828 (5th Cir. 1973)).

A holistic review of the evidence in this case does not show a common policy or practice that similarly affected Hourly Associates throughout Pennsylvania stores whereby Walmart knew Hourly Associates were working during meal breaks.  Cipoletti, the former manager at the West Mifflin store, did testify at his deposition that Walmart's goal was to have zero meal exceptions. (Docket No. 91, Ex. 11 at 124).  However, when he expanded on that comment and its relation to an Excel spreadsheet tracking meal exceptions that was circulated multiple times weekly, Cipoletti explained that if he saw meal exceptions he would "want to know why" a meal break was missed so that it could be resolved and associates could get their breaks.  (*Id.* at 124-25).  Regarding an email with action items for "HR Compliance," saying there was a need to "dig into meal exceptions, [and] make sure we are having conversations around meal/break policies,"[17] Cipolletti explained that meant store managers and leads needed to communicate with their assistant managers to ensure employees were taking their meal breaks.  (*Id.* at 126; Docket No. 92, Ex. 16). And while Plaintiffs argue that their personal experiences and the other evidence discussed *supra* shows that management implicitly instructed Hourly Associates "to keep your mouth shut, report a meal period during your shift (or through a time adjustment next day), and get your work done— irrespective of whether you actually took a meal period," (Docket No. 92 at 19), the evidence

---

[17]    The email was sent by Joey Mendoza, a Walmart market coordinator for Walmart Region 20, which encompasses 30-40 stores in Pennsylvania.  (Docket No. 92 at 12 and n. 8).

presented does not make a modest showing of that conclusion without also making a substantial speculative leap. The evidence that Plaintiffs present equally supports an inference that Walmart's expectation was that its Hourly Associates would take their required meal breaks and notify management if anything got in the way of compliance with Walmart's mandatory meal break policy. That Plaintiffs perceived pressure when—in their estimation—work demands of the day seemed to conflict with their ability to take a meal break, does not support a determination that Walmart policies or practices similarly affected the Hourly Associates that Plaintiffs seek to notify of this suit.[18] In fact, while Plaintiffs argue that the sum of Walmart's unwritten policies, practices, and expectations put them and other Hourly Associates in the position of having to make an uncomfortable dichotomous choice between (a) revealing they had failed to take a meal break, and (b) falsely reporting a meal break, McEnheimer conceded that other employees took a third route and stopped work for their meal break regardless of the consequences. (Docket No. 91, Ex. 8 at 67 (McEnheimer noting that some associates would say "I am due to go [on break] at 2:00, screw you, I am taking my break.")). Jenkins similarly indicated that she sometimes continued to work while other associates took their meal breaks. (Docket No. 91, Ex. 10 at 70 (Q: "Are there times when they took lunch without you?" A: "Just a few – yeah, they would. They would take it without me.")).

---

[18]    *See Rogers v. Ocean Cable Grp. Inc*., No. CIV. 10-4198 NLH KMW, 2011 WL 6887154, at *4 (D.N.J. Dec. 29, 2011) (refusing to conditionally certify class where the evidence presented in support of notice could equally support a showing (a) that the defendant-employer "assigns each technician so many tasks per daily shift that even the most skilled worker could not complete them in eight hours while also accounting for set-up and breakdown time" and (b) "that [the defendant-employer] assigns its workers a reasonable daily workload, and that [the] three plaintiffs take an objectively unreasonable amount of time to complete the assigned tasks," and such evidence did not show a factual nexus between the plaintiffs and prospective opt-ins); *Hughes v. NVR, Inc*., No. 121CV1018RDAIDD, 2022 WL 4856197, at *6 (E.D. Va. Sept. 30, 2022) (refusing to conditionally certify class where the plaintiffs claimed that "performance demands" resulted in an unwritten policy of off-the-clock overtime, and finding that "[a]t most, Plaintiffs' varied experiences are the product of 'happenstance or outlier behavior' from managers, not a uniformly applied policy.'").

Plaintiffs' app data does not fill the inferential gap. That the data from Phase I is voluminous does not necessarily mean it satisfies the modest factual showing standard. Plaintiffs ask the Court to infer from this data and analysis that Walmart knew that notwithstanding its unambiguous break policies, the "reality" was that "excessive workloads and managerial demands, which if ignored risked triggering their own disciplinary consequences, made actually taking (as opposed to simply reporting) a meal unrealistic." (Docket No. 92 at 14-15). However, in the Court's view, the work app data and Dr. Fox's analysis of the data does not support such an inference nor, ultimately, the necessary showing for conditional certification. There are several reasons for this. Initially, Plaintiffs' testimony about their use of work apps muddies the waters of connection between the data, Dr. Fox's analysis, Plaintiffs' circumstances, and the circumstances of other Hourly Associates across Pennsylvania. Confusingly, McEnheimer and the opt-in Plaintiffs in this matter testified that they could not use Walmart apps for work when they were off the clock, making it difficult to connect this data with *their* actual experiences. McEnheimer testified he could not use Walmart apps off the clock (Docket No. 91, Ex. 8 at 114), though he later clarified such statements via declaration wherein he indicated that he remembered specific instances of clocking out but continuing to use GIF off the clock. (Docket No. 91, Ex. 28). Mongelli and Jenkins indicated that their use of Walmart apps was limited if they were clocked out, *e.g.*, Jenkins indicated that if she clocked out, her scanner "wouldn't work" during that time (Docket No. 106-2 at 140) and Mongelli indicated that the apps could only be used while he was on the clock. (Docket No. 106-2 at 171).[19]

---

[19]    Plaintiffs point out that the conflict among work-app data for McEnheimer, Mongelli, and Jenkins and their testimony could be explained by retroactively added meal periods, *i.e.*, times when app data may show work activities being performed by Plaintiffs that overlaps with reported meal breaks because Plaintiffs were working at a time they later falsely reported as a meal break when clocking out at the end of a day. (Docket No. 121 at 8).

Setting aside whether app usage was possible during meal breaks, a more critical concern about the app data and analysis is that the app data does not present enough of a story to show that Plaintiffs and other Hourly Associates were *working* when their activities on apps like GIF and me@Walmart were tracked. Jonathan Kelley—Senior Director of Software Engineering at Walmart Global Tech—explained in his deposition that Walmart does not use me@Walmart timestamps for timekeeping because it has "an entirely separate system for accurately recording time worked for purposes of processing payroll and paying associates for time worked": the GTA. (Docket No. 107-2, ¶ 15). Kelley explained that me@Walmart time stamps are not a reliable source of time keeping for a number of reasons, including: associates share devices, especially company-owned Xcover devices (*id.* ¶ 17); timestamps are not tested for accuracy (*id.* ¶ 20); associates are permitted to use me@Walmart for personal reasons like checking schedules, requesting time off, and applying for jobs (*id.* ¶¶ 27-28); and not all events are as they appear, *e.g.*, certain "Printer and Scanner Events" reflect merely "closing out tabs, changing settings, entering PINs, etc." and do not actually pertain to work-related printing or scanning. (*Id.* ¶¶ 37-38). Some "Printer or Scanner Events" track background app activity, rather than associate activity. (*Id.* ¶ 42). Reviewing the data Dr. Fox relied on, Kelley explained that "none of the me@Walmart app activity data for Mongelli," for instance, "confirms he worked during his unpaid meal periods" and, reviewing the Jenkins data, Kelley arrived at the same conclusion. (*Id.* ¶¶ 51, 52).[20]

---

[20]    Kelley indicated his analysis of the me@Walmart timestamps for the nineteen meal periods identified for Mongelli and Jenkins "took … at least 45 hours (which does not include the time spent by various members of my team who assisted me in preparing the analysis)" and "required [Kelley] to research each individual event name and to analyze the events in the context of other events that occurred during the shift" as well as "similar events for other associates to identify whether an event was a bug, a widespread issued [sic], or some other issue." (*Id.* ¶ 53). This is illuminating in the Court's consideration of the degree of individualized inquiry required in this case.

Weighing evidence is not appropriate here, so the Court will not credit, for example, data review reflected in the Kelley declaration to the extent it would conflict with Dr. Fox's analysis of the same. However, in the Court's analysis a critical fact produced by Walmart is that neither managers nor payroll professionals had access to the data synthesized by Dr. Fox or would be able to "understand or interpret it." (*Id.* ¶ 57).[21] Ultimately, the app data and analysis produced by Plaintiffs is not evidence of off-the-clock work of which Walmart should have known. This case, and the evidence available in it, are distinguishable from cases relied on by Plaintiffs to argue that their evidence satisfies the low threshold of commonality to conditionally certify the collective.

---

[21]     Courts have cautioned that the mere "[a]ccess to records indicating that employees were working overtime … is not necessarily sufficient to establish constructive knowledge." *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781–82 (8th Cir. 2009). This is because the standard for constructive knowledge under the FLSA is whether an employer "should have known" of off-the-clock work, not whether the employer "could have known" about it. *Id.* at 782. In *Hertz*, a group of police officers filed suit against their county for, just as here, the County's "alleged failure to pay overtime compensation" contra the FLSA. *Id.* at 777. If officers for the County worked overtime, they could receive overtime pay by submitting "an overtime slip to their supervisors indicating the amount of time worked in excess of their scheduled hours" which would then be approved by a supervisor and "co-signed by either the division head or the chief deputy" before being forwarded to the payroll office. *Id.* at 779. Officers would typically indicate they had begun their duty for the day by reporting "10-41," and they would signal completion of the end of their duties for the day by reporting "10-42." *Id.* at 778-79. The County was able to record the time when the Computer Aided Dispatch system ("CAD") registered an officer's "10-41" and "10-42" and therefore track officers' "duty-status." *Id.* at 779.

On the plaintiffs' appeal from a jury verdict in the County's favor on all issues and claims, the plaintiff-officers argued that the district court had erred in instructing the jury that "the County had no legal duty to consult the CAD logs for payroll purposes" because the officers said that this instruction prevented them from showing that the county had knowledge or constructive knowledge of their overtime work. *Id.* at 781. The Eighth Circuit Court of Appeals considered the officers' claim that "the CAD records provided evidence of the County's constructive knowledge of the Plaintiffs' overtime hours" because the County had "[a]ccess to records indicating that employees were working overtime," but the Eighth Circuit determined that such was "not necessarily sufficient to establish constructive knowledge." *Id.* at 781-82. The *Hertz* court went on to explain that evidence at trial showed the payroll office had access to CAD records but did not use them for payroll and that the district court's instruction was therefore appropriate because it "would not be reasonable to require that the County weed through non-payroll CAD records to determine whether or not its employees were working beyond their scheduled hours" particularly where there was an established method for overtime claims and there was no evidence that officers were discouraged from submitting overtime slips, nor evidence that "the County was on notice that hours were being regularly under-reported or that it should have been monitoring hours more closely." *Id.* at 782.

For instance, in *Bruno v. Wells Fargo*, the plaintiffs seeking conditional certification of a collective for an unwritten/implied policy to not report off-the-clock overtime alleged that they were *specifically instructed* not to report overtime, and one of the plaintiffs in *Bruno* could name twenty-three other similarly situated employees who received the same specific instruction. 2021 WL 964938, at *4. Opt-in plaintiffs in that case at the time of conditional certification corroborated having received similar specific instruction. *Id.* ("Opt-in Plaintiff Joao Jacinto … testified, 'When we were putting in time sheets, [Wells Fargo management] would tell us don't put in -- you know, you have too many hours, lower your time sheet and don't put so many hours.'"). Such evidence showed that the defendant Wells Fargo had a common practice of directing employees not to report overtime "despite its written policies to the contrary." *Id.*

Where such evidence was present, the *Bruno* court found it was premature to consider and weigh other Wells Fargo employees' declarations that they were not similarly instructed and explained that "[w]hether individualized determinations will predominate and render this case unsuitable for a collective action is more appropriately reviewed during step two of the certification process." *Id.* It weighed heavy in the Court's decision in that matter that the plaintiffs and opt-ins could point to specific instances when they and others were instructed against reporting overtime. That is not what happened here where Plaintiffs indicated that they essentially read between the lines in deciding that they would record meal periods they had not taken and effectively concealed that decision from management to avoid discipline for failing to meet supervisors' productivity expectations or for potentially violating Walmart's mandatory meal-break policy.[22]

---

[22]     In McEnheimer's declaration, he indicated that he spoke with "Jane F.," an assistant manager, telling her that he was unable to take his meal periods and that he needed more time to get his breaks, but McEnheimer clarified that by this he did not mean that he told Jane F. about changing his time records to reflect a break he hadn't taken and that he "never discussed [that] with anyone" because that would be a fire-able offense. (Docket No. 106-2 at 25-28 (Q: "But the specific issue of your changing your time records to reflect the meal period that you actually didn't take, that was never discussed with Jane?"   A: "It was

This case is likewise distinguishable from *Vargas v. Gen. Nutrition Centers, Inc.*, No. 2:10-CV-867, 2012 WL 3544733, at *8-9 (W.D. Pa. Aug. 16, 2012), wherein the plaintiffs proffered evidence showing "a tone of resistance to reported overtime (authorized or not)" involving the defendants' efforts "to individually identify those who accrue overtime expenses, to demand explanations for each use of overtime, to cast the use of overtime pejoratively with terms like 'abuse' or 'costing' the company money, and to impose consequences for being over the allotted budget in the form of either written warnings or possible termination of employment for managers without regard to the question of whether overtime was necessary or not." *Id.* By contrast, the depositions and communications in evidence here do not show a tone that would make authorized overtime unacceptable; to the contrary, there is evidence in the record showing that overtime was generally acceptable. For instance, Mongelli recalled that there was "always overtime to be had." (Docket No. 91, Ex. 9 at 113). Unlike *Bruno*, *Vargas*, and similar cases,[23] the evidence proffered

---

never discussed with anyone. That is an [offense] you are terminated for."); 33 (A: "No. I did not tell her that I was punching in lunches that I had worked through. That would have had me fired immediately." Q: "Why is that?" A: "Because you are not supposed to work off the clock, or you are supposed to be paid for your time working. She didn't want to acknowledge either of those situations." )). McEnheimer testified that Hourly Associates spoke among themselves of the practice of manually adjusting time records to reflect meal breaks that had not actually been taken, and he believed it was general knowledge but could not "confirm" whether management was aware of it. (*Id.* at 38). McEnheimer also testified that he heard rumors of Hourly Associates being "written up over breaks and meal allowances" but that he could not offer specifics. (*Id.* at 64). Regarding employees who conceal working through meal breaks or otherwise working off the clock, courts have held that "[b]y failing to record their hours accurately and failing to tell their supervisors or managers about lunch break work, plaintiffs prevented defendants from having actual knowledge of their off the clock work." *Boelk*, 2013 WL 3777251, at *7 (ruling on defendants' motion for summary judgment as opposed to on motion for conditional certification).

[23]     Plaintiffs also cite: *Steinberg v. TD Bank, N.A.*, No. 10-CV-5600 RMB-JS, 2012 WL 2500331 (D.N.J. June 27, 2012) (granting motion for conditional certification where employees were instructed to arrive early—as many as twenty minutes early—to launch relevant computer systems, but were instructed not to clock in until their scheduled start time); *Sabol v. Apollo Grp., Inc.*, No. CIV.A. 09-CV-3439, 2010 WL 1956591, at *4 (E.D. Pa. May 12, 2010) (conditionally certifying collective when plaintiffs were told by managers that overtime would not be paid for lunch-and-learns or Saturday hours, but employees were "free to come in and work").

for conditional certification here does not show the existence of similarly situated persons with respect to Walmart policies or practices of unpaid work through discouragement of taking or truthfully reporting meal breaks.  Put differently, this evidence does not provide sufficient proof—even under the lenient standard applicable here—that would allow the Court to decide that there is a common "employer policy," that "affected the Plaintiffs in a particular way," and "that also affected other employees in a similar way." *Bob Evans*, 2022 WL 1120048, at *4.  While the bar for an adequate evidentiary showing at step one of conditional certification and notice is low, the Court has a "responsibility to avoid 'stirring up' litigation through unwarranted solicitation" where the low bar is not cleared. *Burkhart-Deal v. Citifinancial, Inc.*, No. 07-1747, 2010 WL 457127, at *5 n. 14 (W.D. Pa. Feb. 4, 2010) (quoting *Brooks v. BellSouth Telecoms.*, 164 F.R.D. 561, 567 (N.D. Ala. 1995)).  It is not unlawful for Walmart to have efficiency standards that are enforced through disciplinary action. *See Evans v. Cont. Callers, Inc.*, No. 4:10CV2358 FRB, 2012 WL 234653, at *5 (E.D. Mo. Jan. 25, 2012) ("The evidence and information before the Court thus showed that plaintiff's decision not to inform CCI that he was not taking lunch breaks, and thus not get paid for working during such breaks, was a decision personal to him and not made pursuant to a CCI policy of which all field service employees were victims.").  Plaintiffs' individual responses to work demands do not justify conditional certification.  Not only that, but the evidence presented shows variability in whether work demands were excessive, not a policy of making them so, *e.g.*, emails in evidence indicate intermittent hiring difficulties and problem solving with respect to scheduling, but not evidence that shows a common policy or practice of understaffing Walmart stores in Pennsylvania.

Overall, the problem with Plaintiffs' motion for conditional certification of the collective is that they have not shown by more than speculation that there are similarly situated Pennsylvania

Hourly Associates with respect to a Walmart policy or practice. Plaintiffs' personal experiences and perceptions with meal breaks do not show, "beyond pure speculation" that there's a "factual nexus between them and those [50],000 other [Hourly Associates] to whom opt-in notice would be sent if this action were conditionally certified." *Bob Evans*, 2022 WL 1120048, at *7. This Court's analysis in *Bob Evans* is instructive in that, there, the Court considered conditional certification for the plaintiffs' claim that they and 40,000 other Bob Evans servers were paid below the minimum wage without receiving a tip-credit notice. *Id.* at *5. Though Bob Evans had a policy of applying tip credit against server wages, six of fifteen declarations submitted by the plaintiffs revealed that the servers did not remember being told their wages would be affected by a tip credit. *Id.* The plaintiffs sought to rely on those declarations to "contend that these six declarations sufficiently establish that they are similarly situated to a putative collective of approximately 40,000 servers who work or worked at 480 Bob Evans-branded restaurant locations nationwide." *Id.* Despite those six declarations, the evidence showed that four of those six declarants had signed off on receiving notice. *Id.* at *6. And, because of that, this Court explained that the plaintiffs could not show they—the named plaintiffs—were similarly affected by a common practice, let alone show that the potential collective was similarly affected by a common practice. *Id.* This Court said that even if it accepted those six declarations, they did not show a policy or practice of providing no tip-credit notice to all servers. *Id.* They provided, "at most" a speculative belief that other servers encountered the same failure of notice and, where Bob Evans provided evidence that it has a policy and practice of providing notice through "multiple means" and other evidence, the Court determined the plaintiffs had not done enough to make the modest factual showing they needed to conditionally certify the class for the tip-credit claim. *Id.* at *7.

Here too the declarations and testimony of Plaintiffs that they worked through meal breaks or chose to falsely report meal breaks does not establish that common evidence will show other Pennsylvania Hourly Associates were denied all appropriate pay.[24]    Additionally, neither Plaintiffs' declarations nor the other evidence, including the GIF and me@Walmart data and analysis, adequately show that Walmart had knowledge or constructive knowledge of a systemic problem whereby Hourly Associates were working through meal breaks.  The data and analysis presented by Plaintiffs perhaps shows that there is common—as opposed to individualized— evidence showing Walmart *could* have known of unpaid overtime hours for some employees by comparing certain data with Hourly Associates' meal breaks.  But such data and the other evidence does not show that Walmart *should* have known of employees' working through meal breaks. Where, as here, there are a multitude of different reasons and scenarios why hourly employees may have worked during unpaid meal breaks but no identifiable common thread other than general workload, other courts have found it improvident to conditionally certify a class of hourly workers. *Folger v. Medicalodges, Inc.*, No. CIV.A. 13-1203-MLB, 2014 WL 2885363, at *4 (D. Kan. June 25, 2014) (explaining that where the plaintiffs alleged FLSA violations based on automatic meal-break deductions because they were "routinely called away from … meal breaks to perform work," the plaintiffs' declarations did not support the existence of a "decision, policy or plan" violative of the FLSA because the declarants had "individual … reasons for not taking a lunch break and/or failing to submit a time clock adjustment").  The variability of meal-break practices among

---

[24]    Plaintiffs argue that they have made a showing that their managers knew they were working off the clock, but their testimony in that regard is speculative, particularly when Plaintiffs testified that they "never discussed with anyone" the practice of reporting meal breaks that they did not actually take.  (Docket No. 91, Ex. 8 at 28; Ex. 10 at 30 (Q: "Did someone at Walmart, whether corporate or at the store, tell you that you should clock out for lunch and continue working?" Jenkins: "No."); Ex. 9 at 69 (Q: "Did you ever report to Taz or Jim that you were working off the clock?"  Mongelli: "… I couldn't say 100%.  Like, I don't really remember the conversations with them because that was so long ago.").

Walmart Hourly Associates makes this case especially inappropriate for conditional certification where evidence in the record shows that meal-break management at Walmart "varies substantially by team and by position or role within each team" where some teams had "all employees … take meal breaks at the same time," while others "allow more flexibility."  (Docket No. 107-5, ¶ 13).[25] In this case, McEnheimer said that he wasn't willing to leave colleagues to fend for themselves when it was busy even though other associates would say "screw you, I am taking my break." (Docket No. 91, Ex. 8 at 67).  Mongelli explained that he worked through lunches in part because his asthma made it harder to do things for him than it was for others.  (Docket No. 91, Ex. 9 at 65). Jenkins stated she would work through unpaid meal periods in order to get caught up on freight loads.  (Docket No. 91, Ex. 10 at 69).  These individual reasons are all different and do not support a common thread of an unwritten policy or plan that makes Plaintiffs or the proposed collective of Hourly Associates similarly situated.  Conditional certification of more than 50,000 Pennsylvania Hourly Associates who worked in over 100 Walmart stores, for a multitude of different supervisors who managed their individual assignments and workloads will result in tremendous expense to the parties and, where Plaintiffs have not justified conditional certification, nor the Court's

---

[25] Evidence in the record suggests that some Walmart associates—like cashiers—have their breaks "closely managed through the Up Front app" which "automatically staggers meal breaks," while other "teams and roles do not use the Up Front app to manage meal breaks" and particularly those teams without a "customer-facing role" could be more flexible with meal break scheduling than others.  (*Id.*).  Hourly Associates in roles that do not require continuous staffing "can typically take their meal breaks at their convenience," though many teams would nevertheless "use meal break schedules."  (*Id.* ¶ 59).  Although whether "individualized determinations will predominate and render this case unsuitable for a collective action is more appropriately reviewed during step two of the certification process," *Bruno*, 2021 WL 964938, at *4, there are instances when it will be apparent that the "commonality of generally applicable employment and compensation policies *necessarily* pales in comparison to individualized determinations of liability," and courts may consider that at conditional certification.  *Stallard v. Fifth Third Bank*, No. 2:12-CV-01092, 2013 WL 12308493, at *3 (W.D. Pa. Dec. 12, 2013) (citation and internal quotation marks omitted).  The variability of how Walmart's meal break policy is put to practice among Hourly Associates throughout Pennsylvania lends itself to a present consideration of whether individualized determinations will eventually dominate in so broad a collective.

involvement in it through approval of notice, the Court "finds that the interests of justice require the case to move forward without certification." *Folger*, 2014 WL 2885363, at *5; *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("[I]t is incumbent upon Plaintiff to propose a class that is sufficiently defined and manageable from the outset.").

### *Equitable Tolling*

Under the FLSA, unpaid overtime compensation claims "must be commenced within two years of the alleged violation or within three years after the cause of action accrued for willful violations." *Vargas*, 2012 WL 5336166, at *4 (citing 29 U.S.C. § 255(a)). "For opt-in plaintiffs," an "action is not commenced until the date on which [opt-ins] file their written consent." *Id.* Opt-ins therefore need equitable tolling if their claim(s) would fall outside the "two-or three-year period preceding their written consents." *Id.* In their motion for conditional certification, Plaintiffs asked the Court to toll the statute of limitations for potential opt-ins during the pendency of the motion, and argued that tolling "from the filing of the motion until the date of the Court'[s] ruling, if the motion is granted, is a reasonable remedy and ensures that Defendant do[es] not reap the benefit of their opposing this motion and also for the protracted delays in producing data at the end of Phase I discovery." (Docket No. 92 at 25). Because the motion for conditional certification will be denied for the reasons set forth *supra*, and the FLSA statute of limitations is already effectively tolled for named plaintiffs, the Court will deny that aspect of Plaintiffs' motion as moot.

### III.  <u>CONCLUSION</u>

For all these reasons, the Court will <u>deny</u> Plaintiffs' motion for conditional certification and equitable tolling. The Court notes that it is not ruling out the possibility that Plaintiffs could "re-define the contours of the proposed collective action" and revisit the issue of conditional certification, particularly if Plaintiffs have some evidence showing that Walmart management

knew or had constructive knowledge that Hourly Associates worked through unpaid meal breaks without compensation and failed to put an end to the practice. *Halle*, 842 F.3d at 224–25. Therefore, the motion will be denied without prejudice. *See, e.g.*, *Folger*, 2014 WL 2885363, at *5.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

cc/ecf:        All Counsel of Record